# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **COURTNEY D. GENTLE** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:21-cv-01638-MHH** |
| | } | |
| **KILOLO KIJAKAZI** | } | |
| **Acting Commissioner of** | } | |
| **Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Courtney Gentle has asked the Court to review a final adverse decision from the Commissioner of Social Security.  The Commissioner denied Ms. Gentle's claims for a period of disability and disability insurance benefits based on an Administrative Law Judge's finding that Ms. Gentle was not disabled.  Ms. Gentle argues that, in denying her request for benefits, the Administrative Law Judge—the ALJ—improperly assessed the medical opinions of Dr. Estock, Dr. Register, Dr. Haney, Dr. Lewis, and Dr. Amason in evaluating her residual functional capacity. After careful review of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Gentle had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited September 26, 2023).

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

On June 24, 2019, Ms. Gentle applied for a period of disability and disability insurance benefits. (Doc. 8-6, p. 6).[2] She alleged that her disability began on August 1, 2018. (Doc. 8-4, p. 24). The Commissioner initially denied Ms. Gentle's claims, and Ms. Gentle requested a hearing before an ALJ. (Doc. 8-5, pp. 5, 12, 16). Ms. Gentle and her attorney attended a hearing on February 9, 2021 via telephone conference. (Doc. 8-3, pp. 43–45). A vocational expert testified via telephone during the hearing. (Doc. 8-3, pp. 61-66).

The ALJ issued an unfavorable decision on February 26, 2021. (Doc. 8-3, pp. 11-23). On October 15, 2021, the Appeals Council denied Ms. Gentle's request for review, (Doc. 8-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

---

[2] The ALJ cited other applications for disability that the Commissioner initially denied and found no reason to reopen those determinations. (Doc. 8-3, p. 12). Based on those earlier decisions, the ALJ applied res judicata through April 16, 2019 and considered only whether Ms. Gentle could "receive disability and disability insurance benefits by virtue of her current application." (Doc. 8-3, p. 12). Ms. Gentle does not challenge this aspect of the ALJ's decision.

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Gentle's Medical Records*

To support her application, Ms. Gentle submitted medical records relating to the treatment and diagnoses of depression, anxiety, seizure disorder, headache disorder, and degenerative joint disease of the right knee. The Court has reviewed Ms. Gentle's complete medical history and briefly summarizes the following medical records because they are most relevant to Ms. Gentle's argument in this appeal.

### *Seizures and Headaches*

In August 2012, after Ms. Gentle had a car accident because of a seizure, (Doc. 8-10, p. 19), Ms. Gentle began treatment for seizures and headaches with neurologist Dr. Amit Arora at Neurology Consultants of Huntsville. (Doc. 8-8, pp. 179-80). Dr. Arora reported that video EEG monitoring indicated "multiple spike-wave discharges that are consistent mostly with an underlying generalized epilepsy disorder." (Doc. 8-8, p. 180). Dr. Arora observed: "There is a possibility that she could have an underlying lesion in her brain, so we are checking an MRI of the brain to rule this out further." (Doc. 8-8, p. 180). Dr. Arora prescribed Lamictal to control Ms. Gentle's seizures. (Doc. 8-8, p. 180).

An October 2012 MRI of Ms. Gentle's brain was "essentially normal." (Doc. 8-8, p. 176). Dr. Arora planned to repeat an EEG study for Ms. Gentle to determine

whether the dosage of Lamictal he prescribed was adequate. (Doc. 8-8, p. 176). During a visit in November 2012, Dr. Arora described Ms. Gentle as having a "very high risk for recurrent seizures" that necessitated treatment with Lamictal, a drug "requiring intensive monitoring for toxicity." (Doc. 8-8, p. 172). Under the heading "Diagnostic Problems," Dr. Arora listed: "generalized epilepsy, intractable"; "transient alteration of awareness"; and generalized anxiety disorder." (Doc. 8-8, p. 172).[3]

Between 2012 and 2014, Ms. Gentle reported a few seizures when she missed doses of her seizure medications. (Doc. 8-8, pp. 166, 170). At some point in this time period, Keppra was added to Lamictal to treat Ms. Gentle's seizures. In March of 2014, Dr. Arora reported that Ms. Gentle "continued to have seizures despite being on Lamictal and Keppra medication." (Doc. 8-8, p. 168). Dr. Arora decreased Ms. Gentle's prescription for Keppra from 1000/1500 mg twice daily to 1000 mg twice daily because the medication levels were elevated. (Doc. 8-8, pp. 167-69). Ms. Gentle reported that she was pregnant and that he her headaches and anxiety had worsened with pregnancy. (Doc. 8-8, p 166).[4] She reported photophobia and phonophobia with her headaches and rated their severity at 8/10. (Doc. 8-8, p. 166).

---

[3] A diagnosis of intractable epilepsy indicates that the seizures continue despite taking antiepilepsy drugs. *See* https://www.healthline.com/health/epilepsy/intractable-epilepsy (last visited September 27, 2023).

[4] Between March 2013 and June 2014, Ms. Gentle had a miscarriage. (Doc. 8-8, p. 164).

In 2015, Ms. Gentle's seizures increased; her headaches were stable, but her anxiety, at times, was not. (Doc. 8-8, pp. 149-157). Dr. Arora increased Ms. Gentle's Lamictal dosage. (Doc. 8-8, p. 160). Ms. Gentle reported a few seizures in 2016, one to two headaches each week, and relatively stable anxiety. Dr. Arora increased her Lamictal dosage again. (Doc. 8-8, pp. 137-145). Between December 2016 and May 2017, Ms. Gentle reported no seizures and one severe headache with nausea that lasted three days. (Doc. 8-8, p. 133). Dr. Arora noted that Ms. Gentle "tried Imitrex and Maxalt" for her headaches but those medications "made her feel bad." (Doc. 8-8, p. 133). Ms. Gentle "developed some dizziness" which Dr. Arora addressed by decreasing Ms. Gentle's dosage of Lamictal. (Doc. 8-8, p. 140).

Between February 2018 and a March 9, 2018 visit with Dr. Arora, Ms. Gentle reported having one seizure after missing her medication. (Doc. 8-8, pp. 129, 131). Ms. Gentle stated she had "occasional headaches" with nausea that she rated a 10/10 on the pain scale. (Doc. 8-8, p. 129). On October 15, 2018, Ms. Gentle reported that since March 2018, she had had one seizure after "missing her medication" and one migraine with nausea that she rated at 10/10. She reported stable anxiety symptoms and no medication side effects. (Doc. 8-8, p. 125).

On July 1, 2019, Dr. Arora noted that Ms. Gentle had "done well since her last visit without reports of seizures." (Doc. 8-13, p. 141). Ms. Gentle stated that she was 13 weeks pregnant and that her anxiety, depression, and headaches were

stable. (Doc. 8-13, pp. 139-42). She had no medication side effects. (Doc. 8-13, p. 139). At a November 13, 2019 visit with Dr. Arora, Ms. Gentle reported that she had a seizure on October 31, 2019 because she forgot to take her medication and was hospitalized for one night. (Doc. 8-13, pp. 115, 135, 138). On December 13, 2019, Ms. Gentle reported that she had no seizures since October 2019 and that her depression and headache symptoms were stable. (Doc. 8-13, pp. 127, 134).

At a June 22, 2020 visit, Ms. Gentle reported that she had four seizures since December 2019 "coinciding with missed doses of her morning Keppra and Lamictal." (Doc. 8-14, p. 38). Dr. Arora indicated that "[h]ormonal changes [might] be a factor" in Ms. Gentle's seizures as she was six months postpartum. (Doc. 8-14, p. 38). Dr. Arora noted that Ms. Gentle's depression and headaches were stable and continued her on Lamictal and Keppra for her seizures. (Doc. 8-14, p. 38). Dr. Arora also noted that Ms. Gentle clearly understood that she could not drive with "seizure activity." (Doc. 8-14, p. 38).

On November 18, 2020, Ms. Gentle reported that she was "compliant with her medication" but had had one seizure since her June 2020 visit. (Doc. 8-14, pp. 167, 170). She reported loss of consciousness and jerking during the seizure. (Doc. 8-14, p. 167). Ms. Gentle indicated that that since the June visit, she had "daily" tension and migraine headaches with photophobia and nausea. (Doc. 8-14, pp. 167,

170).  She indicated that some of her headaches "last[ed] all day" and some were "relieved with [T]ylenol."  (Doc. 8-14, p. 167).

*Anxiety and Depression*

In 2013, Ms. Gentle began mental health treatment at Wellstone Behavioral Health/Mental Health Center in Madison County for depression and anxiety.  (Doc. 8-8, p. 117).  Between 2013 and 2017, Ms. Gentle sought treatment at the mental health center approximately every three months; was diagnosed with major depressive disorder; suffered from anxiety attacks; experienced waxing and waning of her depression and anxiety symptoms; and took Celexa, Remeron, Latuda, and BuSpar to control her symptoms.  (Doc. 8-8, pp. 12-181).[5]

On July 28, 2017, Ms. Gentle saw Nurse Practitioner Marina Nedospasova at Wellstone.  (Doc. 8-8, p. 16).  Ms. Gentle reported that she was 14 weeks pregnant

---

[5]  Celexa is the brand name for citalopram, an antidepressant used to treat major depressive disorder.  *See*  https://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980 (last visited September 26, 2023).

Remeron is a brand name for mirtazapine, an "atypical antidepressant . . . used primarily for the treatment of a major depressive disorder."  *See* https://www.ncbi.nlm.nih.gov/books/NBK519059/#:~:text=Mirtazapine%20is%20an%20atypical%20antidepressant,release%20of%20serotonin%20and%20norepinephrine (last visited September 26, 2023).

Latuda is the brand name for lurasidone, a medication used to treat schizophrenia and bipolar depression.  *See* https://www.ncbi.nlm.nih.gov/books/NBK541057/ (last visited September 26, 2023).

BuSpar is the brand name for buspirone, a medication used to treat anxiety.  *See* https://www.ncbi.nlm.nih.gov/books/NBK531477/ (last visited September 26, 2023).

and that her OB/GYN adjusted her medications because of her pregnancy.  (Doc. 8-8, p. 16).  She denied anxiety or depressive symptoms during the visit.  (Doc. 8-8, p. 16).  CRNP Nedospasova noted that Ms. Gentle had an appropriate affect; displayed fair judgment, insight, attention, and concentration; and was neatly groomed.  (Doc. 8-8, p. 19).  CRNP Nedospasova decreased Ms. Gentle's prescription for BuSpar from 10 to 5 mg.  (Doc. 8-8, p. 20).

At an August 29, 2017 visit, Ms. Gentle denied symptoms of depression or anxiety and reported that she was "doing very well."  (Doc. 8-8, p. 11).  CRNP Nedospasova described Ms. Gentle's depression as controlled and instructed her to continue her medication and follow up in six months.  (Doc. 8-8, pp. 12, 15).

At a February 20, 2018 visit, Ms. Gentle brought her newborn son and stated that she was on maternity leave, but planned to go back to work in two weeks.  (Doc. 8-8, pp. 5-6).  Ms. Gentle reported that she had moderate anxiety but no depression symptoms and indicated that her appetite, energy, motivation level, and sleep patterns were "fair."  (Doc. 8-8, p. 5).  CRNP Nedospasova noted that Ms. Gentle exhibited a positive mood; had fair concentration, insight, and judgment; and was cooperative and neatly groomed.  (Doc. 8-8, pp. 7–8).  CRNP Nedospasova instructed Ms. Gentle to re-start BuSpar and return in four weeks.  (Doc. 8-8, p. 9).

Ms. Gentle returned to Wellstone on February 26, 2019 and saw licensed social worker Charles Griffin.  (Doc. 8-9, p. 36).[6]  Ms. Gentle reported that her "depression and anxiety [started] again"; that she had two deaths in her family she had not handled well; and that she had irritability towards others.  (Doc. 8-9, p. 36). She stated that she cried some days and had difficulty sleeping because her mind raced.  (Doc. 8-9, p. 36).  Mr. Griffin noted that Ms. Gentle had a depressed mood, blunted affect, mildly impaired immediate memory, intact recent and remote memory, logical thought process, low self-esteem, depressive thought content, and good judgment and insight.  (Doc. 8-9, p. 38).

Ms. Gentle saw Nurse Practitioner Jeanne Nelson at Wellstone on March 20, 2019 and stated that her depression became worse after the birth of her son in January 2018.  (Doc. 8-14, p. 151).  Ms. Gentle stated that her depression seemed to worsen "day by day" and described her emotions as "everywhere" from mad to crying. (Doc. 8-14, p. 151).  Ms. Gentle reported difficulty sleeping, decreased energy, memory loss from her seizures, and "somewhat limited" concentration and memory. (Doc. 8-14, p. 151).  Ms. Gentle stated that was not taking medication for her mental health.  (Doc. 8-14, p. 152).  CRNP Nelson noted that Ms. Gentle was neatly groomed and had good attention and concentration during the examination.  (Doc.

---

[6]  The Court could not find evidence in the record that Ms. Gentle sought mental health treatment between February 2018 and February 2019.  CRNP Nelson noted on March 20, 2019 that Ms. Gentle last visited the mental health clinic on February 20, 2018.  (Doc. 8-14, p. 151).

8-14, p. 154).  CRNP Nelson prescribed Zoloft for Ms. Gentle's depression but advised her to consult with her neurologist before taking the Zoloft.  (Doc. 8-14, p. 155).

On July 31, 2019, Ms. Gentle returned to CRNP Nelson and reported that she was 18 weeks pregnant.  (Doc. 8-14, p. 146).  She complained that, despite starting Zoloft, her mood was "a little bit worse" because of her "pregnancy hormones." (Doc. 8-14, p. 146).  She reported depression and anxiety, difficulty sleeping, and decreased energy.  (Doc. 8-14, p. 146).  CRNP Nelson noted that Ms. Gentle had a normal psychiatric examination and good attention and concentration.  (Doc. 8-14, pp. 148-49).  CRNP Nelson added a prescription for Remeron and continued Ms. Gentle on Zoloft.  (Doc. 8-14, p 149).

By an October 30, 2019 follow up, Ms. Gentle reported that she had weaned herself off Remeron because it caused her to gain too much weight with her pregnancy.  (Doc. 8-14, p. 141).  She described her mood as "somewhat everywhere" and reported having a "bad mood" for no reason, decreased energy, and difficulty sleeping.  (Doc. 8-14, p. 141).  CRNP Nelson noted that Ms. Gentle had good attention and concentration during the visit.  (Doc. 8-14, pp. 143-44).  CRNP Nelson

added a prescription for Abilify and continued Ms. Gentle on Zoloft.  (Doc. 8-14, p. 144).[7]

Ms. Gentle reported at a January 30, 2020 visit that she gave birth in December 2019.  (Doc. 8-14, p. 135).  Ms. Gentle stated that she was depressed and had anxiety "through the roof."  (Doc. 8-14, p. 135).  CRNP Nelson noted that Ms. Gentle "[sat] quietly and talk[ed] rather slowly."  (Doc. 8-14, pp. 135, 138).  Ms. Gentle reported that her memory and concentration were "inconsistent" due to seizures.  (Doc. 8-14, pp. 135, 138).  CRNP Nelson noted that Ms. Gentle's attention and concertation were "good."  (Doc. 8-14, p. 138).  Ms. Gentle stated that after consulting with her obstetrician, she did not take Abilify while she was pregnant, but she continued taking Zoloft.  (Doc. 8-14, pp. 135, 138).  CRNP Nelson continued Ms. Gentle on Zoloft and noted that Ms. Gentle would start taking Abilify after an anticipated surgery.  (Doc. 8-14, p. 138).

On April 30, 2020, during the pandemic, Ms. Gentle had a telephone appointment with CRNP Nelson.  She reported that she did not begin using Abilify because she feared she would gain weight.  (Doc. 8-14, p. 129).  She described a "little rough" mood due to a difficult surgery, difficulty sleeping, and fatigue during

---

[7]  Abilify is used to "treat mental conditions such as bipolar I disorder (manic-depressive illness), major depressive disorder, and schizophrenia."  *See* https://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/side-effects/drg-20066890?p=1 (last visited September 20, 2023).

the day. (Doc. 8-14, p. 129). CRNP Nelson noted that Ms. Gentle's [c]oncentration/memory [were] significant for responding to questions in a goal-directed manner." (Doc. 8-14, p. 129). CRNP Nelson discontinued Abilify, continued Ms. Gentle on Zoloft, and added Trazodone for insomnia. (Doc. 8-14, p. 132). By a July 29, 2020 visit, Ms. Gentle reported that her mood was "pretty good." (Doc. 8-14, p. 124). CRNP Nelson noted that Ms. Gentle had good attention and concentration during the examination. (Doc. 8-14, p. 126).

### *Consultative Opinions*

#### *Dr. John Haney's Consultative Mental Examination*

On April 8, 2019, at the request of the Social Security Administration, licensed psychologist Dr. Haney reviewed Ms. Gentle's medical records and examined her. (Doc. 8-9, pp. 42-43). Ms. Gentle reported that she was 26 years old and lived with her grandmother. (Doc. 8-9, p. 42). Her grandmother drove her to the appointment. (Doc. 8-9, p. 42).

Ms. Gentle stated her "longest employment" was for two and a half years as a part-time cashier at Mapco. (Doc. 8-9, p. 42). She indicated that she applied for disability "mostly" because of her seizures and knee issues and had not worked since August 2018 because of her knee pain. (Doc. 8-9, pp. 42-43).

She reported that she last had a seizure in October 2018; "frequently ha[d] partial seizures also," and had "worsening memory difficulties since the seizures

began." (Doc. 8-9, p. 42). Ms. Gentle explained that she had received mental health treatment over the course of seven years. (Doc. 8-9, p. 42). Ms. Gentle complained of sadness, worry, pain, poor memory and concentration, poor stress tolerance, difficulty sleeping, and low energy. (Doc. 8-9, p. 43). Dr. Haney listed Ms. Gentle's prescriptions for seizures, depression, and anxiety and explained that Ms. Gentle regarded the medication as "partially helpful." (Doc. 8-9, p. 42).

Ms. Gentle stated that on an average day, she woke up around 6:00 or 6:30 am, cared for her 15-month-old child, and watched television. (Doc. 8-9, p. 43). She reported that she "used to enjoy spending time with friends and shooting pool" but had no other hobbies or social activities. (Doc. 8-9, p. 43).

Dr. Haney noted that Ms. Gentle was neatly dressed and groomed, had a "sad" mood, and was alert and cooperative. (Doc. 8-9, p. 42). Ms. Gentle could not subtract serial sevens, could count forward by threes slowly, had difficulty performing simple math problems, gave accurate general information, recalled five digits forward and three backward, and recalled one of three objects after five minutes. (Doc. 8-9, p. 42). Dr. Haney noted that Ms. Gentle had "low average" intelligence and intact recent and remote memory. (Doc. 8-9, p. 42).

Dr. Haney diagnosed Ms. Gentle with major depressive disorder with "anxious distress, single episode, moderate." (Doc. 8-9, p. 43). Dr. Haney concluded that Ms. Gentle would "probably continue to require assessment and

treatment of chronic emotional difficulties" and that her "ability to function in work settings appeared moderately to severely impaired due to her emotional limitations." (Doc. 8-9, p. 43).  Dr. Haney noted that Ms. Gentle's "psychological condition" would "probably remain unchanged in the next six to twelve months" and that he regarded Ms. Gentle's statements as "truthful."  (Doc. 8-9, p. 43).

### *Dr. Robert Estock's Consultative Mental Residual Functional Capacity Assessment*

On May 29, 2020, at the request of the Social Security Administration, psychiatrist Dr. Estock reviewed Ms. Gentle's medical records and assessed her mental residual functional capacity.  (Doc. 8-4, p. 16).  Dr. Estock found that Ms. Gentle had moderate limitations in her ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace.  (Doc. 8-4, pp. 16-18).  He assessed that Ms. Gentle had mild limitations in her ability to adapt or manage herself.  (Doc. 8-4, pp. 16-18).

Specifically, Dr. Estock opined that Ms. Gentle could understand and remember short and simple instructions but had moderate limitations in her ability to understand and remember detailed or complex instructions.  (Doc. 8-4, p. 18).  Dr. Estock found that Ms. Gentle could follow one to two step commands and concentrate for two hours at a time on simple, well-known tasks to complete an eight-hour workday.  (Doc. 8-4, p. 18).  Dr. Estock opined that Ms. Gentle should not work "in very close proximity to numerous others"; could respond adequately to

direct, non-confrontational supervision; should have only brief and infrequent contact with the public; and could adapt to "simple, gradual, [and] well-explained workplace changes." (Doc. 8-4, p. 18). Dr. Estock indicated that Ms. Gentle could be "expected to miss a day of routine duties every 30 days or so" because of her mental impairments. (Doc. 8-4, p. 18).

*Dr. Angela Register's Consultative Mental Residual Functional Capacity Assessment*

At the request of the Social Security Administration, on August 28, 2020, psychologist Dr. Register reviewed Ms. Gentle's medical records and assessed her mental residual functional capacity. (Doc. 8-4, pp. 38-40). Dr. Register agreed with Dr. Estock that Ms. Gentle had no more than moderate limitations in her mental functioning. (Doc. 8-4, pp. 38-40).

Dr. Register opined that Ms. Gentle could understand, remember, and carry out simple instructions but not detailed ones. (Doc. 8-4, pp. 38, 40). Dr. Register found that Ms. Gentle could concentrate for two-hour periods on simple tasks, with customary breaks during the workday; could tolerate ordinary work pressures; should avoid "quick decision-making, rapid changes, and multiple demands"; could adapt to infrequent, well-explained changes; would benefit from regular rest breaks and a slowed pace; needed casual, supportive, and non-confrontational criticism and feedback from supervisors; and could "maintain a work pace consistent with the mental demands of competitive level work." (Doc. 8-4, pp. 38-40).

Dr. Register opined that Ms. Gentle could "benefit from a flexible schedule" and might "miss 1-2 days a month of work due to psychiatric signs and symptoms." (Doc. 8-4, p. 40).

### *Ms. Gentle's Function Reports and Questionnaires*

In her January 25, 2020 function report, Ms. Gentle stated that she lived with her aunt, who helped her take care of her two sons. (Doc. 8-7, pp. 45-46). Ms. Gentle indicated that a typical day involved cooking meals for herself and her two sons, changing diapers, making bottles for her baby, watching television, bathing her sons at night, taking a shower, and taking her medications morning and night. (Doc. 8-7, p. 45). She stated that sometimes she needed reminders to take her medications and attend doctor's appointments. (Doc. 8-7, pp. 47, 49).

Ms. Gentle reported that she cleaned the house, did laundry, and washed dishes, but these chores took longer because she would have to sit down "for a little bit." (Doc. 8-7, p. 47). She said her aunt helped her with chores. (Doc. 8-7, p. 47). Though she could not drive because of her seizures, Ms. Gentle indicated that she shopped with her aunt once a week for groceries, household items, and items for her children. (Doc. 8-7, p. 48). Ms. Gentle stated that she managed her own finances. (Doc. 8-7, p. 48). Ms. Gentle reported that she enjoyed watching television and playing games on her phone for a few hours a day, and a "couple of times a week," she spent time doing social activities. (Doc. 8-7, p. 49).

Regarding her limitations, Ms. Gentle stated that she had "bipolar depression and anxiety" which occasionally affected how she got along with others. (Doc. 8-7, p. 50).[8]  She indicated that when she had a bad day, she could not communicate with anyone but her children. (Doc. 8-7, p. 50).  Though she could walk 30 minutes to an hour before needing to rest, Ms. Gentle stated that her knee pain affected her ability to lift, squat, stand, kneel, and climb stairs. (Doc. 8-7, p. 50). Ms. Gentle reported that her seizure disorder affected her memory and concentration, she followed verbal and written instructions "pretty well," she got along well "for the most part" with authority figures, and she completed the tasks that she started. (Doc. 8-7, p. 50).  She stated she could not handle stress well and had anxiety but could handle changes in her routine "for the most part." (Doc. 8-7, p. 51).

In a January 25, 2020 seizure questionnaire, Ms. Gentle reported that her last seizure was October 31, 2019. (Doc. 8-7, p. 24).  Ms. Gentle indicated that stress brought on her seizures. (Doc. 8-7, p. 25).  She stated that she felt out of it and could not concentrate right before a seizure; the length of each seizure varied; and she blacked out, fainted, became unconscious, experienced a "jerking motion," and lost control of her bladder during a seizure. (Doc. 8-7, p. 24).  Ms. Gentle reported that after a seizure, she slept, felt tired, and was "out of it" for a couple of days. (Doc.

---

[8]  The Court has not found a diagnosis for bipolar disorder in the record.  The Court is not sure what Ms. Gentle means by the phrase "bipolar depression."

8-7, p. 24).  Ms. Gentle indicated that she took Keppra and Lamictal regularly for her seizures.  (Doc. 8-7, p. 25).

Ms. Gentle completed her second function report on July 23, 2020, less than one week after she had knee surgery.  (Doc. 8-7, p. 87).  Other than limitations associated with her recovery from the surgery, Ms. Gentle reported that she set an alarm to remind her to take her medications and before the knee surgery, shopped for groceries and essentials a few times a week.  (Doc. 8-7, p. 90).  Ms. Gentle stated that she could not watch television shows or movies with a lot of "flashing" because of her seizures.  (Doc. 8-7, p. 91).  She explained that her epilepsy affected her memory, concentration, and ability to complete tasks.  (Doc. 8-7, p. 92).  She indicated that she could pay attention for "an extended period of time, 15-20 mins," finished what she started, followed written instructions "very well," needed spoken instructions repeated after a few minutes, got along "just fine" with authority figures, and could handle changes in routine.  (Doc. 8-7, pp. 92-93).  She reported that if she got "too stressed out [she] could have a seizure."  (Doc. 8-7, p. 93).

Ms. Gentle indicated that she could not work or drive because of her seizures.  (Doc. 8-7, p. 94).  She reported that if she accidentally missed a dose of her medications, she would have a seizure later that day.  (Doc. 8-7, p. 94).

In a July 31, 2020 seizure questionnaire, Ms. Gentle reported seizures in April, May, and July 2020.  (Doc. 8-7, p. 96).  Her experience with the 2020 seizures was like her experiences with earlier seizures.  (Doc. 8-7, pp. 96-97).

Ms. Gentle reported in a July 31, 2020 headache questionnaire that she had had severe headaches for 16 years since middle school.  (Doc. 8-7, p. 98).  She indicated that heat, flashing lights, and concentrating too long caused her headaches and that she always had a migraine after a seizure.  (Doc. 8-7, pp. 99-100).  Ms. Gentle stated that she had severe headaches "[p]robably 3 or 4 times a month" and described them as pounding, with sharp pain, nausea, and sensitivity to light and sound.  (Doc. 8-7, p. 98).  She indicated that when she had a headache, she took Tylenol and isolated in a dark room.  (Doc. 8-7, pp. 98-99).  Ms. Gentle reported that previously she took prescription medications for her headaches, but they made her "anxious, fidgety, and uncomfortable."  (Doc. 8-7, p. 99).

### *Nonmedical Source Opinion*

On January 30, 2020, Ms. Gentle's aunt, Tammy Phelps, completed a third-party function report regarding Ms. Gentle.  (Doc. 8-7, p. 29).  Ms. Phelps indicated that she lived with Ms. Gentle, drove her to doctor appointments, and helped her with her children "to keep her from stressing out and having seizures."  (Doc. 8-7, p. 30).  Ms. Phelps stated that Ms. Gentle's depression and "bipolar" caused her mind to race and kept her from sleeping; that Ms. Gentle had no problem with self-

care but that she need to have someone with her in case she had a seizure and fell; and that Ms. Phelps had to remind Ms. Gentle to take her medication because her seizures caused "memory loss."  (Doc. 8-7, pp. 30-31).

Ms. Phelps indicated that Ms. Gentle could not go out alone because her seizures prevented her from driving.  (Doc. 8-7, p. 32).  Ms. Phelps stated that Ms. Gentle shopped as quickly as possible because of her anxiety.  (Doc. 8-7, p. 32).  She reported that Ms. Gentle watched television and played with her children but her depression made Ms. Gentle "not want to do them much."  (Doc. 8-7, p. 33).  Ms. Phelps indicated that Ms. Gentle's depression and anxiety caused her to have "problems" with people, not "get out much or go places," and worry about having a seizure.  (Doc. 8-7, p. 34).  Ms. Phelps stated that Ms. Gentle did not handle stress well and that stress caused her seizures.  (Doc. 8-7, p. 35).

### Administrative Hearing

Ms. Gentle's administrative hearing took place via telephone on February 9, 2021.  (Doc. 8-3, p. 43, 45).  Ms. Gentle testified that she lived with her grandmother, aunt, and her two sons, ages three and one.  (Doc. 8-3, p. 49).  She indicated that her grandmother and aunt helped take care of her children.  (Doc. 8-3, p. 61).

Ms. Gentle testified that her past work included bottling prescriptions at Vintage Pharmaceutical; she left that job in 2012 after suffering her first seizure while driving to work.  (Doc. 8-3, p. 50).  Ms. Gentle worked as a cashier for

MAPCO in 2018 but left that that job because she "had to go on maternity leave" for her fist son and "had no babysitter after that." (Doc. 8-3, p. 49). Since having her second child, Ms. Gentle stated that she did not try to return to work because she experienced more seizures. (Doc. 8-3, p. 50).

Ms. Gentle's driver's license was suspended because of her seizures. (Doc. 8-3, pp. 51-52). When she worked at Mapco, her boyfriend's mother drove her to work. (Doc. 8-3, p. 52). She testified that her aunt likely could drive her to work when her aunt was home. (Doc. 8-3, p. 53).

Ms. Gentle stated that she had three right knee surgeries, the first in 2012 and the last in 2020. (Doc. 8-3, pp. 50, 54). She reported that the July 2020 surgery cleaned up scar tissue on her meniscus and corrected a "torn PCL." (Doc. 8-3, pp. 54–55). Ms. Gentle reported that she her right knee pain caused loss of balance and an inability to stand for longer than thirty minutes because of pain. (Doc. 8-3, p. 55). Ms. Gentle stated that she cleaned and did laundry about 15 to 20 minutes at a time before she had to take a 30-minute break because of the moving around and frequent bending. (Doc. 8-3, p. 55). Ms. Gentle reported that she elevated her right leg throughout the day because of swelling, which her doctor indicated was normal after surgery. (Doc. 8-3, p. 56).

Ms. Gentle stated that she experienced severe anxiety and got "worked up" when she could not "get something right." (Doc. 8-3, p. 58). She testified that her

seizures were unpredictable and without warning and that stress could cause a seizure. (Doc. 8-3, pp. 59, 61). Ms. Gentle stated that she had a seizure while she worked at Mapco because of stress of the job. (Doc. 8-3, p. 59). Ms. Gentle reported that her "memory [was] not good," and she could not work at a desk job. (Doc. 8-3, p. 60).

Ms. Gentle indicated that her depression was better because she was on medication, and she reported that the medication did not impair her ability to concentrate. (Doc. 8-3, p. 59). She stated that her depressive symptoms caused her to "stay home" about two or three days a month. (Doc. 8-3, p. 60).

Ms. Sheila Swagler testified as a vocational expert. (Doc. 8-3, p. 61). She classified Ms. Gentle's past work as a cashier as light work but performed at the sedentary and light exertional level and her past work as a packaging tech as medium work. (Doc. 8-3, p. 62). The ALJ asked Ms. Swagler to consider the work available to an individual with the same age, education, and work experience as Ms. Gentle, who could perform light work with the following limitations:

> frequent postural maneuvers; occasional climbing of ramps or stairs; no climbing of ropes, ladders, or scaffolds; would need to avoid concentrated hot or cold temperature extremes; would need to avoid dangerous moving, unguarded machinery, open bodies of water, commercial driving, or unprotected heights; would be able to remember and perform simple 1 to 3-step instructions and tasks; limited to jobs involving infrequent and well-explained workplace changes; limited to casual, non-intensive interaction with co-workers and the general public; and would be able to concentrate and remain on task for two hours at a time sufficient to complete an eight-hour workday.

(Doc. 8-3, p. 63).  Ms. Swagler concluded that an individual with those limitations could not perform Ms. Gentle's relevant past work.  (Doc. 8-3, p. 63).  After the ALJ clarified that the individual would have no limitations in handling, fingering, and feeling, Ms. Swagler stated that individual could perform the light, unskilled jobs of an marker, with 124,700 jobs available in the national economy; a caller, with 12,900 jobs available in the national economy; and checker, with 4,400 jobs available in the national economy.  (Doc. 8-3, pp. 63-64).

In the ALJ's second hypothetical, she asked Ms. Swagler to assume the limitations as in the first hypothetical but the individual would be limited to sedentary work.  (Doc. 8-3, p. 64).  Ms. Swagler testified that individual would be able to perform the sedentary, unskilled jobs of an addresser, with 3,100 jobs available in the national economy; a cutter-and-paster, with 11,800 jobs available in the national economy; and a document preparer, with 19,100 jobs available in the national economy.  (Doc. 8-3, pp. 64–65).[9]

In a third hypothetical, the ALJ asked Ms. Swagler to assume the previous limitations with the added limitation that the individual would be expected to miss work

---

[9]  Ms. Swager testified that the hypothetical individual also could perform a job listed at "DOT code 512.687-086," but the transcript reflects that the testimony regarding the name of that job was "inaudible."  (Doc. 8-3, p. 64).  The Court could not find a job in the Dictionary of Occupational Titles for "DOT code 512.687-086."  The ALJ did not include this job in the list of jobs Ms. Gentle could perform with her RFC.  (Doc. 8-3, p. 23).

two or more days per month on a consistent basis.  (Doc. 8-3, p. 65).  Ms. Swagler

testified that limitation would preclude all competitive work.  (Doc. 8-3, p. 65).

Ms. Gentle's attorney asked Ms. Swagler to combine the three hypothetical

individuals with the added limitation that the individual would need a sit or stand option,

which included a thirty-minute stand then rest rotation, and would miss more than two

days of work per month because of mental health or other medical issues.  (Doc. 8-3,

pp. 65–66).  Ms. Swagler stated those limitations would preclude all competitive work.

(Doc. 8-3, p. 66).

## THE ALJ'S DECISION

The ALJ found that Ms. Gentle had not engaged in substantial gainful activity

between her alleged onset date of August 1, 2018 through the date she was last

insured on September 30, 2020.  (Doc. 8-3, p. 14).[10]  The ALJ determined that Ms.

Gentle suffered from the severe impairments of seizure disorder, degenerative joint

disease of the right knee, headache disorder, anxiety, and depression.  (Doc. 8-3, p.

14).  The ALJ also determined that Ms. Gentle had the non-severe impairment of

obesity, but no doctor had indicated that her weight contributed to her physical or

mental impairments.  (Doc. 8-3, p. 14).  The ALJ acknowledged the mention of

---

[10]  A claimant is eligible for disability insurance benefits if she had a disability on or before the
date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A).  If a claimant becomes disabled after
her insured status expires, the ALJ must deny the disability insurance benefits claim.  The date of
last insured requirement does not apply to a claim for SSI benefits.

fibromyalgia in some of Ms. Gentle's medical records but found that fibromyalgia was not a medically determinable impairment under Social Security Ruling 12-2p because the record did not include evidence of a diagnosis of or treatment for fibromyalgia.  (Doc. 8-3, p. 14).  Based on a review of the medical evidence, the ALJ concluded that, through the date she was last insured, Ms. Gentle did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1. (Doc. 8-3, p. 14).

Considering Ms. Gentle's impairments, the ALJ evaluated Ms. Gentle's residual functional capacity.  (Doc. 8-3, p. 17).  The ALJ determined that Ms. Gentle had the RFC to perform:

> light work . . . except that she could perform frequent postural maneuvers. She could climb ramps and stairs occasionally; but she never could climb ladders, ropes[,] or scaffolds. The claimant should . . . avoid[] concentrated exposure to hot or cold temperature extremes; and she should . . . avoid[] all exposure to dangerous, moving, unguarded machinery, open bodies of water, commercial driving[,] and unprotected heights. The claimant could remember and perform simple, 1-3-step instructions and tasks and could concentrate and remain on task for 2 hours at a time, sufficient to complete an 8-hour workday. The claimant was limited to casual, non-intensive interactions with co-workers and the general public; and she was limited to jobs with infrequent, well explained workplace changes.

(Doc. 8-3, p. 17).

Based on this RFC and relying on the testimony from the vocational expert, the ALJ concluded that Ms. Gentle could not perform her past relevant work.  (Doc.

8-3, p. 22).  Relying on testimony from the vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Ms. Gentle could perform including marker, caller, and checker.  (Doc. 8-3, pp. 22-23). Accordingly, the ALJ determined that, through the date last insured, Ms. Gentle was not disabled as defined by the Social Security Act.  (Doc. 8-3, p. 23).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial evidence, then the district court "must affirm even if the evidence preponderates against the

Commissioner's findings." *Costigan v. Comm'r of Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Gentle contends that the ALJ improperly evaluated the opinions of the non-examining and examining consultative doctors who opined as to her (Ms. Gentle's) mental and physical limitations. (Doc. 10). Among other things, Ms. Gentle argues that the ALJ improperly evaluated Dr. Register's opinion and Dr. Estock's opinion in determining the mental components of the RFC for light work, particularly Dr. Estock's and Dr. Register's opinions concern monthly absences from work. (Doc. 10, pp. 15-16). The Court finds Ms. Gentle's argument persuasive.[11]

---

[11] Ms. Gentle offers additional arguments regarding these medical opinions and the ALJ's RFC finding. (Doc. 10, p. 21). Because the Court will remand based on the ALJ's improper evaluation of Dr. Register's and Dr. Estock's opinions, the Court will not reach Ms. Gentle's additional arguments.

An ALJ must consider five factors when evaluating the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5); *see Harner v. Social Security Admin., Comm'r*, 38 F.4th 892, 897 (11th Cir. 2022).[12] The most important factors are supportability and consistency, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] determination or decision." 20 C.F.R. § 416.920c(b)(2).[13] When considering the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). And when considering the consistency of a medical opinion, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 416.920c(c)(2).

---

[12] In her brief, Ms. Gentle cited regulations that apply to disability applications filed before March 27, 2017. (Doc. 10, pp. 14-15). Because Ms. Gentle filed her disability application after March 27, 2017, the Court must apply the new regulation found in 20 C.F.R. § 416.920c. *See Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 894 (11th Cir. 2022).

[13] An ALJ does not have to articulate how she considered the other three factors. 20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

Here, the ALJ stated generally that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 C.F.R. § 416.920c." (Doc. 8-3, p. 17). In discussing Dr. Estock's opinion, the ALJ stated:

> [Dr. Estock] opined that the claimant [could] understand and recall simple instructions and [could] follow simple 1-2 step commands for 2-hour periods during an 8-hour workday. [Dr. Estock] stated that the claimant [could] have brief, superficial and infrequent contact with the public; and she [could] respond adequately to direct, non-confrontational supervision. [Dr. Estock] opined that the claimant [could] adapt to simple, gradual, well-explained workplace changes and [could make] adequate simple workplace decisions. [Dr. Estock] further opined that the claimant was likely to miss one day of work per month.

(Doc. 8-3, p. 21). As to Dr. Register's opinion, the ALJ stated:

> [Dr. Register] opined that the claimant [could] understand and remember simple, but not detailed, instructions. [Dr. Register] stated that the claimant [could] carry out and sustain attention to simple tasks for extended periods, although she should avoid quick decision-making, rapid changes and multiple demands with regular rest breaks and a slowed, although competitive pace. [Dr. Register] stated that contact with the public should be casual, feedback should be supportive, and changes should be infrequent and well[-]explained.

(Doc. 8-3, p. 21).

The ALJ found Dr. Register's and Dr. Estock's opinions "mostly persuasive," but she determined that "Dr. Estock's opinion about missed work [was] not supported by the evidence." (Doc. 8-3, p. 21). The ALJ added:

> The [Register and Estock] opinions are supported by the consultants' reviews of the evidence and are consistent with the

> evidence that the claimant retains intact memory, concentration, attention, judgment[,] and concentration[] and is consistently cooperative in spite of occasional depressed or anxious mood (Exhibits B4F, B5F, B16F).  Some of their residual functional capacity language is vague, however, and not defined by the Dictionary of Occupational Titles or the Social Security Regulations.  The mental residual functional capacity as defined above is more specific and well defined but is not inconsistent with the opinions of Dr. Estock and Dr. Register.

(Doc. 8-3, p. 21).

In determining a claimant's RFC, an ALJ does not have to discuss every piece of evidence or adopt every limitation in a medical opinion, *Hollingsworth v. Comm'r of Soc. Sec.*, 846 Fed. Appx. 749, 753 (11th Cir. 2021), but an ALJ must explain her selective treatment of a medical opinion to allow a reviewing court to understand the reasons the ALJ found that certain limitations were not supported by or consistent with the medical evidence.  Here, the ALJ explained that the mental residual functional capacity she assigned for Ms. Gentle was "more specific and well defined but [] not inconsistent with the opinions of Dr. Estock and Dr. Register."  (Doc. 8-3, p. 21).  The administrative record contradicts this explanation.

As an initial matter, Dr. Estock and Dr. Register both used standard form MRFC1 to report their evaluations of Ms. Gentle.  (Doc. 8-4, pp. 17, 38).  Both completed the form questions and the final "Additional Explanation" section at the end of the form.  (Doc. 8-4, pp. 18, 40).  The information in the forms is not unusual or vague.

The ALJ did not adequately explain why she believed that the record does not support Dr. Estock's and Dr. Register's shared opinion that Ms. Gentle could be expected to miss one day of work per month because of her major depressive disorder and anxiety.  To be clear, the ALJ did not mention Dr. Register's opinion concerning monthly absences from work; the ALJ specifically mentioned only Dr. Estock's opinion that Ms. Gentle would be expected to miss one day of work a month because of her mental impairments.  (Doc. 8-3, p. 21).  After describing several components of Dr. Estock's opinion, the ALJ stated that Dr. Register "reviewed the evidence on 8/28/20 and agreed with Dr. Estock's assessment."  (Doc. 8-3, p. 21). The Court cannot tell whether the ALJ, in citing Dr. Register's general agreement with Dr. Estock, included in that agreement Dr. Estock's finding that Ms. Gentle would miss one day of work each month because of her mental impairments.  And the Court cannot tell whether the ALJ considered Dr. Register's related but more restrictive finding that Ms. Gentle's mental impairments could cause her to miss one to two days of work each month.  Presumably, if the ALJ determined that "Dr. Estock's opinion about missed work [was] not supported by the evidence," then the ALJ would reach the same conclusion about Dr. Register's opinion regarding one to two absences per month, but the ALJ's opinion is silent with respect to Dr. Register's assessment.

The Commissioner stated in her brief that the ALJ "noted that a finding about missing work 1-2 days a month was unsupported by the evidence." (Doc. 11, p. 8). The Court has not located this finding in the ALJ's opinion. Dr. Register's opinion regarding absences of 1-2 days per month is significant because the VE testified that two or more absences on a consistent basis could preclude Ms. Gentle from competitive work. (Doc. 8-3, p. 65).[14]

The Commissioner argues that the ALJ mistakenly attributed the "missed work" limitation to Dr. Estock but "still discounted the limitation that would preclude work . . . and Plaintiff does not contend that the ALJ's reason for discounting the limitation is unsupported . . . ." (Doc. 11, p. 8). If the ALJ mistakenly confused Dr. Estock's opinion with Dr. Register's opinion when the ALJ discounted the "missed work" limitation, the ALJ did not properly explain her decision to discount Dr. Register's opinion that Ms. Gentle's mental impairments could cause her to miss work 1-2 days a month.

For purposes of this opinion, the Court will assume that the ALJ intentionally cited Dr. Estock's finding regarding absence from work and discounted the finding because, in the ALJ's view, the finding "was not supported by the evidence." (Doc. 8-3, p. 21). The ALJ did not cite evidence that was inconsistent with Dr. Estock's

---

[14] The ALJ did not pose a hypothetical that included the limitations that Dr. Estock and Dr. Register found—missing one to two days a month.

or Dr. Register's opinion and did not elaborate on her conclusion that the finding that Ms. Gentle would miss at least one day of work per month was not supported by the medical evidence.  Consequently, the Court cannot tell what evidence the ALJ had in mind, and the ALJ did not meet her regulatory obligation to explain the supportability and consistency of Dr. Estock's and Dr. Register's opinions regarding monthly absences from work.  *Pierson v. Comm'r of Soc. Sec.*, No. 6-19-cv-01515, 2020 WL 1957597, at *4 (M.D. Fla. Apr. 8, 2020) (the "new regulations require an explanation, even if the ALJ believe[s] an explanation is superfluous").

If the Court were to guess why the ALJ discounted Dr. Estock's opinion and presumably discounted Dr. Register's as well, the Court would consider the emphasis the ALJ placed on the fact that Ms. Gentle's "mental health providers consistently not[ed] normal attention, concentration and thought process in spite of occasional depressed or anxious mood." (Doc. 8-3, p. 20).  The ALJ repeatedly cited mental health providers' notes that Ms. Gentle had good attention and concentration during their appointments, (Doc. 8-3, pp. 19-20), but Ms. Gentle's ability to cooperate and concentrate during mental health appointments does not necessarily mean that she could respond appropriately to a supervisor in a work setting on a consistent basis or that her ability to respond appropriately most days somehow indicated that she would not miss one to two days of work per month because of her mental health limitations.  *See Priscilla Marie P. v. Comm'r of Soc. Sec.*, No. 1:20-

cv-02917-CMS, 2022 WL 20611246, *6 (N.D. Ga. Jan. 18, 2022) (claimant's alertness and ability to concentrate during a medical examination did not mean she could maintain alertness or concentration for eight hours a day, for five days a week).

In any event, a reviewing court is not permitted to guess why an ALJ found that a consultative opinion was not supported by the evidence. An ALJ "must build a logical analytical bridge explaining what particular evidence undermined [the medical] opinions and why." *Brown v. Comm'r of Soc. Sec.*, No. 6:20-cv-840-GJK, 2021 WL 2917562, at *4 (M.D. Fla. July 12, 2021) (internal citations and quotations omitted). A district court cannot "scour the entirety of the record, with no guidance from the ALJ, in an attempt to divine what record evidence the ALJ believes creates unspecified inconsistencies" in a doctor's opinion. *Pierson v. Comm'r of Soc. Sec.*, No. 6-19-cv-01515, 2020 WL 1957597, at *4 (M.D. Fla. Apr. 8, 2020). Here, the ALJ did not bridge the gap and did not adequately explain why she discounted the absence from work limitation.[15]

---

[15] Ms. Gentle also argues that the ALJ improperly assessed Dr. Register's and Dr. Estock's opinions regarding non-confrontational, supportive supervision. (Doc. 10, pp. 15-16). The ALJ acknowledged this limitation but did not include the limitation in a hypothetical to the vocational expert or in Ms. Gentle's RFC. (Doc. 8-3, pp. 17, 21). Ms. Gentle argues that the ALJ improperly excluded from the RFC Ms. Gentle's need for a flexible schedule and limitation for one to two step tasks. (Doc. 10, pp. 15-16). Ms. Gentle asserts that the ALJ did not explain why the RFC states that she could perform one to three step tasks when Dr. Estock limited her to two step tasks at most. (Doc. 10, p. 15). On remand, the ALJ should explain her reasons for discounting these mental health limitations. The ALJ also should consider the extent to which Ms. Gentle's mental health impairments were intertwined with her seizures and her migraine headaches. The narrative sections of Dr. Estock's and Dr. Register's opinions suggest that both recognized the medical evidence associating Ms. Gentle's mental health impairments with her physical impairments of seizures and migraine headaches.

Because the ALJ did not provide sufficient reasoning to demonstrate that she conducted a proper legal analysis in evaluating Dr. Estock's and Dr. Register's opinions, remand is warranted. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (The ALJ's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); *see also Spaar v. Kijakazi*, No. 5:20-cv-94, 2021 WL 6498838, at *5, *report and recommendation adopted*, 2022 WL 141613 (S.D. Ga. Jan. 14, 2022) (concluding that error in failing to address the supportability of medical opinions could not be harmless under the new regulations where the medical opinions, if adopted as a component of the claimant's RFC, could have resulted in the difference between performing light work and being disabled).

On remand, the Court recommends additional discussion of Dr. Haney's opinion. The ALJ found Dr. Haney's opinion "not persuasive" because of Dr. Haney's "relatively benign findings" and his finding that Ms. Gentle was "neatly dressed and groomed, polite[,] and cooperative"; had intact memory; engaged in logical conversation; and could manage her own funds. (Doc. 8-3, p. 20). These findings are not necessarily inconsistent with Dr. Haney's opinion that Ms. Gentle had moderate to severe limitations in her ability to work. The ALJ stated that Dr. Haney's conclusions were inconsistent with records from medical providers who noted Ms. Gentle had "normal attention, concentration[,] and thought process in

spite of occasional depressed or anxious mood." (Doc. 8-3, p. 20). As discussed, the fact that Ms. Gentle could concentrate during an examination and had normal thought processes does not necessarily mean that she would not have moderate to severe limitations in a work setting because of her depression and anxiety.

## CONCLUSION

For the reasons discussed above, the Court finds that the ALJ did not properly evaluate Dr. Register's and Dr. Estock's opinions under 20 C.F.R. § 416.920c. Accordingly, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this September 30, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE